**E-FILED**
Wednesday, 26 June, 2013  03:14:07 PM
Clerk, U.S. District Court, ILCD

# IN THE UNITED STATES DISTRICT COURT
# FOR THE CENTRAL DISTRICT OF ILLINOIS, SPRINGFIELD DIVISION

| | | |
|---|---|---|
| RONNIE K. STITES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 12-3155 |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of | ) | |
| Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION

BYRON G. CUDMORE, U.S. MAGISTRATE JUDGE:

Plaintiff Ronnie K. Stites appeals the denial of his application for Supplemental Security Income (Disability Benefits) under title XVI of the Social Security Act.  42 U.S.C. §§ 405(g), 1381a, 1382c, and 1383(c). Stites has filed a Brief in Support of Motion for Summary Judgment (d/e 10), and Defendant Acting Commissioner of Social Security (Commissioner) has filed a Motion for Summary Affirmance (d/e13).[1]  The parties consented, pursuant to 28 U.S.C. § 636(c), to proceed before this Court.  Consent to Proceed Before a United States Magistrate and Order of

---

[1] Carolyn Colvin is now Acting Commissioner of Social Security.  Motion for Summary Affirmance, at 1 n.1.  Colvin is, therefore, automatically substituted in as the Defendant in this case.  Fed. R. Civ. P. 25(d).

<u>Reference</u>, entered November 1, 2012 (d/e 9).  For the reasons set forth below, the Decision of the Commissioner is AFFIRMED.

STATEMENT OF FACTS

Stites was born on November 26, 1966.  He secured a GED.  He suffers from plantar fasciitis of the left foot, lower back pain, urinary frequency, obesity, bipolar disorder, schizoaffective disorder, major depressive disorder, dysthymic disorder, and antisocial personality disorder.  R. 31, 54.

Stites received Disability Benefits from 1989 until 2006.  The Disability Benefits stopped when Stites began serving a term of imprisonment after his convictions for aggravated DUI and driving on revoked license.  He was released 5, 2008, and applied for Disability Benefits on December 8, 2008.  R. 14.  Stites has no relevant past work history.  R. 37-38.

On December 15, 2008, Stites went to Transitions of Western Illinois (Transitions) for counseling.  The counselors prepared a case opening assessment at that time.  Stites reported that he had problems dealing with other people.  He easily got upset, frustrated and angry with others.  He also felt depressed.  He stated he wanted to learn how to handle his response to other people and to become less depressed.  R. 366.   Stites

did not report having any hallucinations or suicidal ideations.  R. 407.

Stites reported that he was under the care of Dr. Sanchez for psychiatric

reasons in 2006.  R. 367.  Stites reported that he underwent inpatient

psychiatric treatment twice, both more than five years earlier.  R. 367.

Stites reported that he was divorced and was living with his girlfriend

Camillia Jessie.  He reported that Jessie had been his girlfriend for three

years.  He reported that he had daily contact with his 17 year old daughter

Caroline.  He reported that she did not live with him.  R. 411.

The counselors at Transitions assessed Stites to have a flat affect

and depressed mood, and guarded demeanor.  Stites also showed poor

insight and poor judgment.  R. 375.  The counselors diagnosed Stites with

dysthymic disorder; polysubstance abuse, early full remission; and

antisocial personality disorder.  R. 376.  The counselors gave him a Global

Assessment of Functioning (GAF) score of 45.  The counselors noted that

Stites had a serious impairment in social and occupational functioning.  The

counselors further recommended a psychiatric evaluation.  R. 378.

On December 18, 2009, Stites' girlfriend Jessie completed a Function

Report, Adult Third Party form.  R. 198-205.  Jessie reported that she had

known Stites for three years.  Stites lived with her and her ten year old son.

She reported that Stites mostly watched television during the day.  She

cooked and did the household chores for Stites. Stites dressed himself and took care of his own personal care, although he did not shave as often as she would like. He did not need special reminders to care for himself or take medication, except that she had to remind him to shave. He did some household repairs and mowing. She reported that he complained about back pain when he did these chores. He helped discipline her son. She reported that he went shopping with her. He did not go by himself. She reported that he was not able to handle money. She reported that he did not like to socialize and mainly spent his time with her. He spent some time with his daughter. She reported that he had memory problems and could not concentrate all the way through watching a movie. She reported that he followed spoken instructions "pretty good." R. 202.

On December 18, 2008, Stites filled out a Function Report – Adult form. Stites reported that he lived with his girlfriend and her son. He reported that he spent his time watching television and talking on the phone. Stites reported that he had trouble remembering things. He also reported having racing thoughts. He reported that he dressed himself and took care of his own personal care. He reported that he could not prepare meals because he had no patience and could not focus. He reported that he could walk four blocks. He could only pay attention for short periods.

He reported that he did not get along with authority figures at all.  R. 214-21.  Stites reported that his ability to follow spoken instructions was "sometimes good."  R. 219.

On January 6, 2009, Stites saw a counselor at Transitions.  The counselor talked with Stites about needing to be more social and finding ways to get out more.  R. 433.  On January 9, 2009, Stites again saw a counselor again at Transitions.  The counselor discussed the possibility of seeing a psychiatrist.  Stites stated that he was not interested in seeing a psychiatrist at that time.  He was happy with his current counseling.  R. 430.

On January 10, 2009, state agency physician Dr. Raymond Leung, M.D., performed a consultative physical examination of Stites.  R. 355-60.  Stites reported having low back pain and decreased memory.  Stites stated that he thought the memory impairment came from his past drug use.  He reported that he quit all drugs in November 2006.  Dr. Leung reported that the medical history was significant for bipolar disease and schizoaffective disorder.  Stites did not use a cane or walker to walk.  Stites reported that he could walk two blocks and lift five pounds.  R. 355.  On examination, Dr. Leung stated, "From observation, I do believe that the claimant may have difficulties managing his own funds due to decreased memory."  R. 456.

Stites was six feet one-quarter inch tall and weighed 268 pounds.  Stites walked "slightly slow and stiff."  R. 357.  Stites extension of the lumbar spine was limited to five degrees.  Dr. Leung's impression was low back pain and decreased short term memory.  R. 357.

On January 15, 2009, state agency psychologist Dr. Frank Froman, Ed.D., conducted a consultative psychological examination of Stites.  Dr. Froman diagnosed schizoaffective disorder and antisocial personality traits.  He gave Stites a GAF score of 48.  Dr. Froman opined,

> **CONCLUSIONS:**  Ronnie appears able to perform one and two-step assemblies at a competitive rate.  He is not able to relate adequately to coworkers and supervisors.  He understands simple oral and written instructions but because of memory loss, is unlikely to be able to retain oral instruction at all.  He is able to manage cash benefits with the assistance of his fiancé.  It is most unlikely that he would be able to withstand the stress associated with customary employment.

R. 361-64 (emphasis in the original).

On January 23, 2009, Stites saw a counselor at Transitions of Western Illinois, to address problems with anger.  R. 432.

On January 28, 2009, state agency physician Dr. Towfig Arjmand, M.D., prepared a Physical Residual Functional Capacity Assessment of Stites.  R. 381-87.  Dr. Arjmand opined that Stites could lift twenty pounds occasionally and ten pounds frequently; stand and/or walk six hours in an eight-hour workday; sit six hours in an eight-hour workday; frequently climb

ramp and stairs; occasionally climb ladders, ropes, and scaffolds; and crouch no more than frequently.  R. 381-82.

On February 3, 2009, state agency psychologist Dr. Joseph Mehr, Ph.D., prepared a Psychiatric Review Technique Form and a Mental Residual Functional Capacity Assessment.  R. 388-405.  Dr. Mehr opined that Stites suffered from dysthymic disorder versus schizoaffective disorder; antisocial personality disorder; and alcoholism in remission.  R. 391, 395-96.  Dr. Mehr opined that Stites had moderate restrictions on activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace.  Dr. Mehr opined that Stites had no episodes of decompensation.  R. 398.  Dr. Mehr noted, "He appears to have some difficulty in relating wel (sic) to others, but does have a girlfriend.  ADLs indicate he prefers not to socialize, but is able to do simple daily tasks such as chores."  R. 400.

Dr. Mehr further opined that Stites was moderately limited in his ability to: understand and remember detailed instructions; carry out detailed instructions; perform activities within a schedule and maintain regular attendance, and be punctual; complete a normal workday and workweek without interruptions from psychological symptoms; interact appropriately

with the public; accept instructions and respond appropriately to criticism from supervisors; and respond appropriately to changes in the work setting. R. 402-03.

On February 27, 2009, Stites saw a counselor at Transitions. The counselor discussed situations in which Stites' frustration level increased and how to address these situations and how to address his anger in these situations. The counselor gave Stites an anger worksheet to complete. R. 434.

On March 20, 2009, Stites saw a counselor at Transitions. Stites brought the anger worksheet back with him. The counselor discussed ways to communicate anger effectively. The counselor also prompted Stites to name people he can use as a support group. The counselor noted, "Ronnie was open & responsive to questions. He realizes learning to deal with his anger is very important and that having positive people in his life is crucial to his wellbeing." R. 429.

On April 4, 2009, Stites completed a Function Report – Adult form. R. 245-52. Stites reported that he had difficulties dressing himself and caring for himself. He reported that he had to be reminded to shave, shower, and take his medicine. He reported that he had trouble standing for any period of time. He reported being afraid of people. He reported

that he talked to his girlfriend and her son once a day because they lived with him.  He reported that once or twice a month he went "to church to eat."  R. 249.  He reported being in constant pain.  He reported that he could walk half a block.  He reported that he did not follow spoken instructions well at all.  R. 250.

On June 4, 2009, state agency psychologist Dr. Patricia Beers, PhD., affirmed the opinions of Dr. Mehr.  R. 444-46.

On August 13, 2009, Stites saw Dr. Ben Wilde, D.O., for back and shoulder pain.[2]  Stites also reported having chest pains and shortness of breath once a night before going to bed.  Stites reported racing thoughts and feeling anxious.  He reported using a cane to walk.  His psychiatrist at Transitions, Dr. Valentina Vrtikapa, M.D., changed his medication to try to address his anxiety.  Dr. Wilde prescribed physical therapy and stretching exercises for the back pain.  R. 449-50.

On October 5, 2009, Stites saw Dr. Wilde for palpitations that had gone on for a month.  He reported that they were worse at night.  He also reported shortness of breath and chest pain.  His EKG was normal.   Dr.

---

[2] The records sometimes indicate that Dr. Wilde is an M.D., but other places indicate that he is a D.O. See e.g., R. 478 (M.D.); but see R. 481 (D.O).  His formal signature block on R. 481 and elsewhere uses D.O.  So the Court uses D.O.  Dr. Wiles is an acceptable medical source regardless of whether he is a medical doctor or a doctor of osteopathy.  20 C.F.R. §§ 404.1513(a) and 416.913(a).

Wilde diagnosed palpitations.  Dr. Wilde also gave Stites trigger point injections for lower back pain.  R. 480-81.

On October 28, 2009, Stites saw Dr. Wilde again.  Dr. Wilde recommended physical therapy, but Stites refused because he was too anxious to go.  Dr. Wilde reported that Dr. Vrtikapa changed Stites' psychiatric medication because the prior medication was causing palpitations.  Dr. Wilde diagnosed chronic lower back pain and plantar fasciitis.  R. 477-78.

On December 4, 2009, Stites saw Dr. Wilde for a follow-up.  Dr. Wilde diagnosed anxiety and shortness of breath.  Dr. Wilde indicated that due to his anxiety, Stites would not go to a hospital.  R. 475.

On April 6, 2010, Stites saw Dr. Vrtikapa for medication monitoring. R. 527-29.  Stites was anxious and down.  Stites reported that he heard voices, but denied any command hallucinations.  Stites denied having any suicidal or homicidal ideations.  R. 528.  Dr. Vrtikapa increased the dosage of Stites medication and scheduled Stites for another visit in four weeks.  R. 528-29.

On April 13, 2010, one of Stites' counselors at Transitions, Kendra Bartz, completed a form entitled, "Medical Source Statement of Ability to do Work-Related Activities (Mental)."  R. 488-90, 571-75.  Bartz opined that

Stites had mild restrictions on his ability to understand and remember

simple instructions; no restrictions in carrying out simple instructions;

moderate restrictions on his ability to make judgments on simple work-

related decisions and to understand and remember complex instructions;

and marked restrictions on his ability to carry out complex instructions and

to make judgments on complex work-related decisions.[3]  R. 488.  Bartz

stated,

> Due to client's mental illness, client has extreme problems that
> impact daily functioning.  Depression/anxiety make his ability to
> carry out work-related abilities difficult.  However client is able
> to carry out simple instructions and follow directions properly.

R. 488.

Bartz opined that Stites had marked restrictions on his ability to

interact appropriately with the public; extreme restrictions in his ability to

interact appropriately with supervisors and co-workers; and marked

restrictions in his ability to respond appropriately to usual work situations

and to changes in a routine work setting.  R. 489.  Bartz stated,

> Client has extreme symptoms of depression Dx of major
> depressive, schizoaffective, dysthymic disorder + antisocial
> personality disorder.  Client battles anger due to his mtl illness.

---

[3] Bartz scratched out and initialed the first set of marks she made in rating Stites' restrictions in these areas, and on other parts of this form.  See R. 488, 490.  The Court refers to the Bartz's final ratings rather than the ones she scratched out and initialed.

R. 489.  Bartz agreed with Stites that his disability began on September 1,

1987.  R. 490.  Bartz also noted that Stites had a history of substance

abuse, but currently reported that he was not using any alcohol or other

drugs.  R. 490.

On April 15, 2010, Stites went to Transitions to meet with his

counselor.  R. 525-26.  Stites rated his depression as a 9 on a scale of 1 to

10.  He reported no suicidal or homicidal thoughts.  R. 526.

On April 15, 2010, Stites saw Certified Nurse Practitioner Julie Barry

at Blessing Hospital in Quincy, Illinois, for a periodic follow up evaluation.[4]

R. 531-32.  Stites complained of anxiety and difficulty sleeping.  He also

reported low back pain and heel pain.  He also reported difficulty urinating

and transient, sharp chest pain. Barry noted that Stites had a flat affect.

Stites reported being anxious around people.  Stites did not appear anxious

during the visit.  Barry scheduled Stites for another visit at the Outreach

Clinic in a month.  R. 531.

On May 12, 2010, Stites's case manager at Transitions, Katie

Wiskirchen, prepared a service plan for Stites for six months.  R. 513-16.

Wiskirchen gave Stites a GAF score of 45. R. 513.  Wiskirchen stated that

Stites had "anger and depression evidenced by outbursts and strained

---

[4] The medical records identify Barry both as an M.D. and a CNP.  R. 532.  Barry's revised signature
indicates CNP, so the Court will identify her that way.

relationships resulting in increase of anger and depressive symptoms." R. 514.

On June 15, 2010, Stites saw Dr. Vrtikapa for medication monitoring. R. 518-20.  Stites reported that he was hearing voices at times, but denied any suicidal ideations.  R. 519.  Dr. Vrtikapa continued Stites current treatment and scheduled him for another visit in six weeks.  R. 519-20.

On August 10, 2010, Stites saw Dr. Vrtikapa for medication monitoring.  R. 591-93.  Stites displayed a neutral mood.  He reported hearing voices, but no commands.  He denied any suicidal or homicidal ideations.  R. 592.

In August 2010, Bartz reaffirmed the opinions she set forth in her April 2013 Medical Source Statement.  R. 571-75.

On September 15, 2010, the Administrative Law Judge (ALJ) conducted an evidentiary hearing by video conference.  The ALJ conducted the hearing in Chicago, Illinois.  Stites and his attorney appeared by video conference from Hannibal, Missouri.  A vocational expert Carl Barchi appeared by telephone.  R. 12.

Stites testified first.  Stites testified that he was unable to work,

Because I've got bipolar disorder and I have memory loss and anxiety and pain in my lower back and pain in my left heel in my foot and I have a fear of people.  I'm afraid they're out to get me, and I can't lift any weight because of my lower back.

R. 16.  Stites testified that he has been seeing Dr. Vrtikapa since he was released from prison.[5]  R. 16.  He initially saw Dr. Vrtikapa once a month; by the time of the hearing, he was seeing her once every two months.  R. 16-17.  In addition, Stites saw a counselor at Transitions on a weekly basis.  R. 18-19.   Stites testified that his girlfriend drove him to his appointments at Transitions.  R. 19.  Stites testified that he lived with his girlfriend and her ten year-old child.  R. 20.  He lived with her before he was incarcerated and came back to live with her upon his release from prison.  R. 23.

Stites testified that he heard voices of people talking to him.  He also saw "ghost people."  The ghost people were dead.  R. 27.  He testified that sometimes the voices told him to hurt himself.  He testified that the voices told him to hurt himself about once a day.  R. 28.  He testified that the ghost people tried to talk to him.  R. 28.  He saw the ghost people, "Like once a day and sometimes it's not for days."  R. 28.  He testified that he has been hearing voices since 1987.  R. 29.

Stites testified that he was taking medicines for his psychiatric conditions, but the medication was unhelpful.  Stites testified that he still felt depressed and could not "manage myself out in public or anything like

---

[5] The court reported spelled Dr. Vrtikapa's name phonetically as Dr. Brotakoppa and Dr. Vertakoper. R. 16 and R. 30.

that."  R. 17.  Stites explained that he had a bad temper when he was around people, and so, avoided going out anywhere.  R. 17-18.  Stites testified that he still heard the voices.  R. 28.

The ALJ asked Stites how his mental condition affected him.  Stites responded, "It affects me in the way where I want to hurt myself at times and I just don't want to talk to nobody and stuff like that."  R. 24.  Under questioning by his counsel, Stites stated the he got "real nervous and sweaty palms" when he was around other people.  R. 29.  He testified that he got very aggravated if someone told him what to do, "To the point where I'm yelling and screaming, hollering."  R. 29.  He testified that would start screaming when "things won't go my way."  R. 30.

Stites testified that he had heel pain from plantar fasciitis.  He testified that he had a steroid injection in March 2010, but it did not help.  He still had pain every day.  R. 20.  Stites wore inserts in his shoes for the condition.  Stites testified that the inserts did not help either.  Stites testified that he felt the heel pain all of the time, regardless of whether he was on or off of his feet.  He testified that the doctors recommended massaging the foot, soaking the foot in hot water, staying off hard floors, and always wearing shoes.  R. 21.  Stites testified that he took Neurontin and Gabapentin for his heel and back pain.  R. 22.

Stites testified that his back pain started in 2006 when he fell down a flight of stairs.  The doctors diagnosed arthritis in his back.  R. 22.  Stites testified that his back pain sometimes radiated down both his legs to his knees.  Stites testified that the back pain was worse when he moved around.  R. 31.  Stites testified that the doctors recommended exercise and physical therapy.  R. 22.  Stites testified that he had not yet started physical therapy.  He testified, "I just got the order in the last week."  R. 22

Stites testified that he could stand for five to fifteen minutes at a time, sit for fifteen minutes at a time, and walk short distances.  R. 23.  Stites testified that he could lift a gallon of milk with pain.  R. 35.  He testified that his physical condition has remained the same since he fell in 2006.  R. 24.

Stites testified that he also had bladder problems.  Stites testified that he had to use a catheter three times a day to empty his bladder.  He testified that he had scar tissue from the catheters.  R. 33.

Stites testified that in a typical day, he watched television for about twelve hours.  R. 24.  He spent most of the day in bed.  R. 34.  Stites testified that he did not take naps or nod off during the day.  R. 34.  Stites did not have any problems concentrating on the television programs.  R. 30.  Stites testified that he sometimes cooked, but did not do housework or yard work.  R. 24.   Stites testified that he collected Hot Wheels toy cars.

He used a computer once to read his mail over the Internet.  R. 27.  Stites testified that he only left the house to go to appointments.  He testified that his girlfriend drove him.   R. 25-26.  Stites' girlfriend was disabled and did not work.  Stites testified that the girlfriend cared for her daughter.  R. 24-26.  Stites' girlfriend also did all the shopping.  R. 26.

Stites testified that he was unable to sleep because he had racing thoughts.  He testified that it took him hours to fall asleep.  He testified that he also regularly woke up to use the bathroom.  He testified that he usually woke up once a night.  He testified that he was not refreshed in the morning, but felt moody.  R. 33-34.

Stites testified that while he was in prison he only received ibuprofen for his back and foot pain.  He saw a psychiatrist once while in prison.  He received no psychiatric medicines.  He testified that he had flare ups and mood swings, but did not get into any trouble fighting.  R. 33.

The vocational expert Barchi then testified.  The ALJ asked Barchi a series of hypothetical questions.  For each question, the ALJ asked Barchi to assume a person of Stites' age with a GED and no past relevant work. The ALJ asked Barchi to assume such a person could perform light work, but would not be able to climb ladders, ropes of scaffolds and would only be able to crouch and climb stairs and ramps frequently; could only perform

"simple, routine, repetitive tasks in a work environment free of fast paced production requirements involving only simple work related decisions and with few if any work place changes." R. 37-38. The person also could not interact with the public and could only interact occasionally with coworkers. R. 38. The ALJ asked, "Based on those limitations would there be any jobs that the individual could perform in the economy?" R. 38.

Barchi opined that such a person could perform unskilled factory work such as assembly and packaging work. He also opined that such a person could perform cleaning and food preparation activities. He opined that 15,000 packer jobs existed in Missouri, 12,500 light cleaning jobs existed in Missouri, 1,600 food preparation jobs that did not involve contact with the public existed in Missouri. R. 39.

The ALJ then asked Barchi to assume the person needed to alternate between sitting and standing so long as they were not off task more than ten percent of the time as a result. R. 41. Barchi opined that this additional limitation would not affect the ability of the person to perform the jobs described in his opinion. R. 41.

The ALJ also asked Barchi to assume the person described in the hypothetical question had to avoid all contact with the public or coworkers. Barchi opined that this additional limitation would eliminate about fifty

percent of the jobs he previously identified because of the limitation of no contact with coworkers.  R. 42-43.

The ALJ asked Barchi whether a person could work if he had to miss three days of work per month.  Barchi opined that such a person could not work.  R. 43.  Barchi further opined that a person could not work if the "individual has no ability whatsoever to interact appropriately with a supervisor."  R. 43.  Barchi further opined that a person could not work if he could not remember oral or written instructions.  R. 44.  Barchi finally opined that a person could not work if he had "a marked impairment in the ability to interact appropriately with the public; extreme impairments in the ability to interact appropriately with supervisors and coworkers and a marked impairment in the ability to respond appropriately to usual work situations and to changes in a routine work setting."  R. 45.  The ALJ then concluded the hearing.

<u>THE DECISION OF THE ALJ</u>

The ALJ issued his decision on November 10, 2010.  R. 52-63.  The ALJ followed the five-step analysis set forth in Social Security Administration Regulations (Analysis).  20 C.F.R. §§ 404.1520, 416.920.  Step 1 requires that the claimant not be currently engaged in substantial gainful activity.  20 C.F.R. §§ 404.1520(b), 416.920(b).  If true, Step 2

requires the claimant to have a severe impairment.  20 C.F.R. §§

404.1520(c), 416.920(c).  If true, Step 3 requires a determination of

whether the claimant is so severely impaired that he is disabled regardless

of the claimant's age, education and work experience.  20 C.F.R. §§

404.1520(d), 416.920(d).  To meet this requirement at Step 3, the

claimant's condition must meet, or be medically equivalent to, one of the

impairments specified in 20 C.F.R. Part 404 Subpart P, Appendix 1

(Listing).  20 C.F.R. §§ 404.1520(d), 416.920(d).  If the claimant's

impairments, combination of impairments, do not meet or equal a Listing,

then the ALJ proceeds to Step 4.

If the claimant is not so severely impaired, then Step 4 requires the

claimant not to be able to return to his prior work considering his age,

education, work experience, and Residual Functional Capacity (RFC).  20

C.F.R. §§ 404.1520(e), 416.920(e).  If the claimant cannot return to his

prior work, then Step 5 requires a determination of whether the claimant is

disabled considering his RFC, age, education, and past work experience.

20 C.F.R. §§ 404.1520(f), 416.920(f).  The claimant has the burden of

presenting evidence and proving the issues on the first four steps.  The

Commissioner has the burden on the last step; the Commissioner must

show that, considering the listed factors, the claimant can perform some

type of gainful employment that exists in the national economy.  Briscoe ex
rel. Taylor v. Barnhart, 425 F.3d 345, 352 (7th Cir. 2005); Knight v. Chater,
55 F.3d 309, 313 (7th Cir. 1995).

The ALJ found that Stites met his burden at Steps 1 and 2.  He had
not engaged in substantial gainful activity since December 8, 2008, when
he filed his application, and he suffered from severe impairments of plantar
fasciitis of the left foot, low back pain, urinary frequency, obesity, bipolar
disorder, schizoaffective disorder, major depressive disorder, dysthymic
disorder and antisocial personality disorder.  R. 54.

At Step 3, the ALJ found that Stites' impairments, or combination of
impairments, did not meet or equal a Listing.  The ALJ found that Stites'
back pain did not meet Listing 1.04 for disorders of the spine, and his
plantar fasciitis and urinary frequency did not meet any of the
musculoskeletal Listings 1.00, and Genitourinary Listings 6.00,
respectively.  R. 54.

The ALJ found that Stites' mental conditions did not meet Listings
12.03 for schizophrenic disorders, 12.04 for affective disorders, and 12.08
for personality disorders.  R. 55.  In Paragraph B of each of these three
Listings, the person must have mental impairments that result in two of the
following:  marked restrictions on activities of daily living; marked difficulties

in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration.  R. 55; Listings 12.03(B); 12.04(B); 12.08(B).  The ALJ found no evidence of decompensation and only moderate restrictions or difficulties in each of the other three categories.

The ALJ found that the evidence showed that Stites' limitations in daily activities resulted primarily from back pain and plantar fasciitis rather than mental impairments.  The ALJ found some mental limitations on daily activities because Stites' anxiety and phobias affected his ability to leave the house.   The ALJ found that the opinions of Drs. Mehr and Beers supported his finding of moderate limitations.  R. 55.

The ALJ found that Stites had some ability to engage in social functioning.  The ALJ noted that Stites has maintained a relationship with his girlfriend for four years even while he was incarcerated, he went to church twice a month, and he talked on the phone daily with his daughter.  The ALJ also noted that he had no problems interacting with doctors and counselors and he did not get into fights at prison.  The ALJ found that the opinions of Drs. Mehr and Beers supported his finding of moderate limitations.  R. 55.

The ALJ found that Stites had some ability to concentrate because his girlfriend reported that he could follow spoken instructions pretty good, and he could concentrate at the hearing.  The ALJ also relied on the opinions of Drs. Mehr and Beers to conclude that Stites' had moderate limitations in this area.  R. 55-56.[6]

At Step 4, the ALJ found that Stites had the RFC to perform light work, but he: must be allowed the option to sit or stand at will provided he is off task no more than ten percent of the time; can only occasionally climb ladders, ropes, or scaffolds; can only frequently crouch or climb stairs or ramps; can only perform simple, routine and repetitive tasks in a work environment free from fast paced production requirements and involving only simple, work-related decisions with few if any work place changes; cannot interact with the public; and may only occasionally interact with coworkers.  R. 56.  The ALJ relied on the opinions of Drs. Arjmand, Mehr and Beers in making this RFC determination.  R. 60.

In making the RFC finding, the ALJ found that Stites' claims regarding the severity of his symptoms and limitations was not credible.  The ALJ stated that Stites testified at the hearing that he could only sit or stand for

---

[6] A person's impairments could also meet each of these Listings if he met the requirements of paragraph C of each Listing (rather than paragraph B).  The ALJ found no evidence that Stites met the requirements of paragraph C.  R. 56; see Listing 12.03(C), 12.04(C), and 12.08(C).  Stites does not challenge this finding.

fifteen minutes, walk half a block and lift four pounds.  The ALJ also noted that Stites testified that he stayed home "practically all the time," and had minimal social contacts.  The ALJ noted that Stites told Dr. Leung he could walk two blocks and lift five pounds.  R. 57.  The ALJ further noted that the doctors only recommended home exercises and soaking his feet.  R. 59.  The ALJ noted that Stites avoided physical therapy.  The ALJ stated that his claims were inconsistent with medical examinations that showed good range of motion.  The ALJ also noted that Stites testimony was contradicted by his girlfriend.  She stated that Stites handled his own personal care, mowed the lawn, did household repairs and went out to shop.  R. 59.  The ALJ also found that Stites had no problems concentrating during the hearing.  R. 59.  The ALJ noted that Stites claimed to have anger problems, but the evidence revealed no incidents of anger in interactions with medical professionals or state agency employees.  R. 60.  The ALJ also noted that Stites testified that he had trouble sleeping, but he reported to Dr. Froman that he slept eight hours a day.  R. 58.  The ALJ found, "Each one of these factors harms the credibility of the claimant's allegations and strongly advises against finding greater restrictions than I have stated."  R. 60.

The ALJ gave little weight to Dr. Froman's opinions.[7]  The ALJ found them inconsistent with other parts of the record.  The ALJ also found that Dr. Froman's opinions were inconsistent with the evidence he cited to support his findings at Step 3.  The ALJ stated that Dr. Froman did not find Stites to be disabled and did not consider the "effect of reasonable occupational restrictions on the claimant's ability to work."  R. 61.  The ALJ found little or no support in the record for Dr. Froman's opinion that Stites could not follow spoken instructions.  The ALJ cited the girlfriend Jessie's statement that Stites could follow directions and the ALJ's observations of Stites at the hearing.  R. 61.  The ALJ explained,

> My residual functional capacity [finding] takes into account the claimant's social difficulties and concentration-related difficulties by limiting him to no public interactions and only occasional interaction with coworkers.  Simple, routine and repetitive tasks is proper, with few changes, thus limiting the claimant's exposure to stress and the extent and complexity of spoken instructions.

R. 61.

The ALJ gave the opinion of Bartz little weight because she was not an acceptable medical source; she opined about Stites' condition at the onset date of January 8, 2008, but she first met Stites in late 2008; she gave her opinions a year after she stopped counseling Stites; she had no

---

[7] The ALJ incorrectly referred to Dr. Froman by his first name, Dr. Frank.  R. 60.  The error was harmless.

information of how Stites ever interacted with any coworkers because he
was not working when she counseled him;  and her opinions contradicted
her notes which indicated that his attention and memory were within normal
limits, that the medications had a fair impact on Stites' symptoms, and that
he was no longer having suicidal ideations.  R. 61.

Based on the RFC determination the ALJ found at Step 5 that Stites
could perform a substantial number of jobs that exist in the national
economy.  R. 62.  The ALJ relied on the Medical-Vocational Guidelines, 20
C.F.R. Part 404, Subpart p, Appendix 2, and the opinions of vocational
expert Barchi that Stites could perform the factory jobs, cleaning jobs, and
food preparation jobs.  R. 62.

The ALJ also found that the Commissioner met his burden at Step 5
even if Stites' RFC was modified to limit him to no contact with any
coworkers, "Lastly, if the residual functional capacity above were retained,
further reducing the claimant's interactions with co-workers to none, 50% of
the general factory, light cleaning and food preparation would remain,
enough to be a significant number."  R. 63.  The ALJ concluded that Stites
was not disabled.  R. 63.

Stites appealed the ALJ's decision.  On April 6, 2012, the Appeals
Council denied Stites' request for review.  The decision of the ALJ then

became the decision of the Commissioner.  R. 69.  Stites then brought this action for judicial review.

## ANALYSIS

This Court reviews the Decision of the Commissioner to determine whether it is supported by substantial evidence.  In making this review, the Court considers the evidence that was before the ALJ.  Wolfe v. Shalala, 997 F.2d 321, 322 n.3 (7th Cir. 1993).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate" to support the decision.  Richardson v. Perales, 402 U.S. 389, 401 (1971).  This Court must accept the findings if they are supported by substantial evidence, and may not substitute its judgment.  Delgado v. Bowen, 782 F.2d 79, 82 (7th Cir. 1986).  This Court will not review the credibility determinations of the ALJ unless the determinations lack any explanation or support in the record.  Elder v. Astrue, 529 F.3d 408, 413-14 (7th Cir. 2008).  The ALJ must articulate at least minimally his analysis of all relevant evidence.  Herron v. Shalala, 19 F.3d 329, 333 (7th Cir. 1994).  The ALJ must "build an accurate and logical bridge from the evidence to his conclusion."  Clifford v. Apfel, 227 F.3d 863, 872 (7th Cir. 2000).

In this case, the decision is supported by substantial evidence.  The ALJ's findings at Steps 1 and 2 are undisputed.  The ALJ's findings at Step

3 that Stites did not meet Listing 1.04 are supported by Dr. Leung's examination and the opinion of Drs. Arjmand.  The finding that Stites did not meet Listings 12.03, 12.04, and 12.08 are supported by the evidence cited by the ALJ and the opinions of Drs. Mehr and Beers.  The ALJ's RFC finding at Step 4 is supported by the opinions of Drs. Arjmand, Mehr, and Beers.  The finding at Step 5 is supported by the opinions of vocational expert Barchi.

Stites argues that the ALJ erred at Step 3 by finding that Stites did not meet the mental health Listings, 12.03, 12.04, and 12.08.  Stites argues that the ALJ ignored the evidence from Drs. Leung and Froman, and counselor Bartz.  The Court disagrees.  The ALJ did not mention the opinions of these three during his analysis of these three Listings at Step 3; however, the ALJ did address the opinions of Dr. Froman and Bartz directly.  R. 60-61.  The ALJ explained why he gave those opinions little weight.  The ALJ found Dr. Froman's opinion regarding Stites' ability to retain and follow instructions to be inconsistent with Jessie's statement.

The ALJ found Bartz's opinion that Stites was extremely limited in his ability to interact with others was inconsistent with Stites' interactions with Jessie and her son, with Stites' daughter, with health care professionals, and with the ALJ at the hearing; and with Stites' regular attendance at

church.  The ALJ also found that these opinions were inconsistent with the opinions of Drs. Mehr and Beers.  Thus, the ALJ logically explained the basis for his treatment of the opinions of Dr. Froman and Bartz based on evidence in the record.  See Clifford v. Apfel, 227 F.3d at 872.

The ALJ also considered that Bartz was not an acceptable medical source such as a doctor or licensed psychologist.  See 20 C.F.R. §§ 404.1513(a) and 416.913(a).  As such, Bartz's opinion is not entitled to be given any particular weight.  See 20 C.F.R. §§ 404.1527(d) and 416.927(d).  The opinion, however, is relevant and the ALJ must consider it.  SSR 96-3p.  The ALJ did so.  The ALJ concluded that the opinion should be given little weight, but he did consider it.  R. 61.

The ALJ did not directly address in his opinion Dr. Leung's opinion that Stites might have difficulty managing his own funds due to decreased memory.  The Court sees no error because handling one's finances is not directly at issue in this case, and because the ALJ addressed Stites' memory problems in his decision.  The ALJ found moderate restrictions on concentration, persistence or pace at Step 3, in part, because of Stites' memory problems.  R. 55.  The ALJ also addressed the memory problems at Step 4 as part of his problems with concentration, persistence or pace.  The ALJ limited Stites' RFC to "[s]imple, routine and repetitive tasks . . .

with few changes," to limit Sties' "exposure to stress," and also "the extent and complexity of spoken instructions."  R. 61.  Therefore, the ALJ considered and addressed Stites' memory problems.  There was no error in not mentioning this sentence in Dr. Leung's report.

Stites argues that the ALJ should have found him disabled because of his GAF scores.  Stites urges the Court to follow persuasive authority that holds that the ALJ must consider a claimant's GAF score history and a GAF score below 50 is evidence of disability.  See Pate-Fires v. Astrue, 564 F.3d 935, 944 (8th Cir. 2009).  The Seventh Circuit has rejected such reliance of GAF scores.  The Seventh Circuit noted that the score rates the worst of either a patient's symptoms or his functional limitations.  "[T]he score does not reflect the clinician's opinion of functional capacity.  Accordingly, 'nowhere do the Social Security regulations or case law require the ALJ to determine the extent of an individual's disability based entirely on his GAF score.'"  Denton v. Astrue, 596 F.3d 419, 425 (7th Cir. 2010) (quoting Wilkins v. Barnhart, 69 Fed. Appx. 775, 780 (7th Cir. 2003)).  This Court will follow the Seventh Circuit.  The properly ALJ considered the GAF scores along with other evidence.  See R. 58-59.  There was no error in the consideration of GAF scores.

Stites argues that the ALJ erred because he should not have relied on the opinions of Drs. Arjmand, Mehr, and Beers, but should have credited the opinions of Dr. Froman, the statement by Dr. Leung, and the opinions of Bartz.  Stites essentially asks the Court to reweigh the evidence.  He argues The Court does not reweigh the evidence.  See Schmidt v. Astrue, 496 F.3d 833, 841 (7th Cir. 2007).  The ALJ explained why he gave greater weight to the opinions of Drs. Mehr and Beers.  The ALJ further explained why he did not give weight to the opinions of Dr. Froman and Bartz.  The ALJ, thus, built a logical bridge from the evidence to his conclusion.  See Clifford v. Apfel, 227 F.3d at 872.  The Court will not reweigh this evidence.

The Court notes that Bartz's opinions regarding Stites' memory is consistent with the ALJ's findings and contradicts Dr. Froman's opinion and Dr. Leung's comment regarding memory loss.  Bartz opined that Stites had mild restrictions on his ability to understand and remember simple instructions; no restrictions in carrying out simple instructions; and moderate restrictions on his ability to make judgments on simple work-related decisions and to understand and remember complex instructions.  R. 488.  Bartz's opinions on these matters are consistent with the opinions of Drs. Mehr and Beers, and the RFC findings of the ALJ.

Bartz's opinions are also consistent with the ALJ's alternative finding at Step 5.  Bartz's primarily opined that Stites could not get along with other people and could not handle to changes in his routine.  R. 489.  The ALJ limited Stites' RFC to few if any work place changes.  The ALJ further found that Stites could perform a significant number of jobs in the national economy even if he was limited to no contact with coworkers as well as no contact with the public.  R. 63.  Vocational expert Barchi's testimony supported this finding.  This finding is consistent with Bartz's opinion that Stites could not handle contact with either coworkers or the public.   Thus, even if the ALJ gave more credit to Bartz's opinion, the outcome would not have changed.

Stites argues that the ALJ erred in making the RFC determination.  Stites argues that the ALJ failed to include additional limitations in the RFC determination to account for Stites' difficulty in relating to others and in his memory loss.  The Court disagrees.  The ALJ limited the RFC to simple repetitive tasks, to no contact with the public, and only limited contact with coworkers.  The ALJ used these limitations on the RFC to address these issues.  The ALJ's decision to do so is supported by the opinions of Drs. Mehr and Beers, as well as the other evidence on which the ALJ relied.  The ALJ's FRC determination is supported by substantial evidence.

Stites argues that the ALJ's credibility determination was erroneous.
This Court will not review the credibility determinations of the ALJ unless
the determinations lack any explanation or support in the record.  Elder v.
Astrue, 529 F.3d 408, 413-14 (7th Cir. 2008).  The record shows several
inconsistencies in Stites' representations.  Stites reported in December
2008 that he could dress himself, take care of his personal needs, and walk
four blocks.  By April 2009, Stites reported that he could not dress himself,
could not care for his personal needs and could only walk half a block.  In
January 2009, Stites told Dr. Leung that he did not use a cane to walk.  By
August 2009, Stites told Dr. Wilde that he used a cane to walk.  Stites,
however, testified that his physical condition had not changed since 2006.
R. 24.  Stites also told Dr. Froman that he slept eight hours a day, but he
testified at the hearing that he could not sleep at all at night and did not
sleep during the day.  Stites' girlfriend Jessie reported that Stites made
home repairs and mowed the lawn.  Stites testified that he did not do any
yard work.  Stites told Dr. Vrtikapa that he had heard voices, but denied
any command hallucinations.  Stites testified that he both heard voices and
saw "ghost people," and further that the voices told him daily to hurt
himself.  Stites never reported to Dr. Vrtikapa any visual hallucinations or
any commands to hurt himself.  Such inconsistencies provide ample

support for the ALJ's credibility determination.  The Court will not review that determination.

Finally, Stites argues that the ALJ erred by not asking Barchi about inconsistencies between his opinions and Department of Labor's Dictionary of Occupational Titles (DOT).  Barchi opined that a person of Stites' age, education, and RFC could perform jobs listed in the DOT even if he needed to change from sitting to standing at will (sit/stand option).  The DOT job definitions, however, do not address sit/stand options.  Stites argues that the ALJ erred in not asking Barchi about this inconsistency.  <u>See</u> SSR 00-4p.

The Court sees no error.  The ALJ is only required to inquire <u>sua sponte</u> into conflicts between the vocational expert's testimony and the DOT when the conflict is apparent.  <u>Overman v. Astrue</u>, 546 F.3d 456, 463-64 (7th Cir. 2008).  The fact that the DOT does not discuss sit/stand options does not demonstrate an apparent conflict with Barchi's testimony about the impact of a sit/stand option.  <u>See</u> <u>Zblewski v. Astrue</u>, 302 Fed. Appx. 488, 494 (7th Cir. 2008) ("Because the DOT does not address the subject of sit/stand options, it is not apparent that the testimony conflicts with the DOT.").  Therefore, the ALJ was not required to inquire about any such

conflicts unless Stites raised the issue at the hearing.  <u>Terry v. Astrue</u>, 580 F.3d 471, 478 (7th Cir. 2009).  He did not do so.  There was no error.

WHEREFORE, Defendant Acting Commissioner of Social Security Motion for Summary Affirmance (d/e13) is ALLOWED and Stites' Brief in Support of Motion for Summary Judgment (d/e 10) is DENIED.  The decision of the Acting Commissioner is AFFIRMED.  All pending motions are denied as moot.   THIS CASE IS CLOSED.


ENTER:   June 25, 2013

　　　　　　　　　　　　　　　　　　*s/ Byron G. Cudmore*
　　　　　　　　　　　　　　　　UNITED STATES MAGISTRATE JUDGE